Frank A. Bridge and Mary J. Bridge, Trading as Frank A. Bridge and Company, Appellants, v. Massachusetts Bonding and Insurance Company, Appellee.

Gen. No. 9,181.

Opinion filed October 19, 1939.

GIFFIN, LINDNER, NEWKIRK & JONES, of Springfield, for appellants.

GILLESPIE, BURKE & GILLESPIE, of Springfield, for appellee.

MR. PRESIDING JUSTICE RIESS delivered the opinion of the court.

Plaintiffs appellants, Frank A. Bridge and Mary J. Bridge, partners doing business under the firm name of Frank A. Bridge and Company, filed suit in the circuit court of Sangamon county, Illinois, seeking recovery from the defendant appellee, Massachusetts Bonding and Insurance Company, under the provisions of a certain safe burglary policy No. BS 369442, for an alleged loss suffered by the plaintiffs on April 12, 1935, in their retail jewelry store in Springfield, Illinois.

Judgment in bar of the action was entered by the court upon trial of the cause without a jury, from which an appeal was taken to this court.

At the time of the loss in question, the plaintiffs conducted a retail jewelry store in said city having a frontage of approximately 16 feet and a depth of 65 feet. The rear or east one-fourth of the store was used for office quarters and the remaining part in the front for display of the stock of jewelry and merchandise, which was separated from the office portion by a counter. There were three safes in the store and all are described and covered by the policy in question and mentioned and identified therein and in the evidence as Safes Nos. 1, 2 and 3. Safe No. 1 was located in the northeast corner of the store proper or space available to customers, while Safes Nos. 2 and 3 were located in the rear office quarters; Safe No. 2 being in the extreme southeast corner and Safe No. 3 being nearby against the east or rear wall.

Safe No. 1 was equipped with three sets of doors. The outer double doors were designated as fire and burglarproof doors and were controlled by a combination lock. Inside the outer doors was a pair of thin inner doors opening in the center and controlled by a key-operated lock. Within the inner doors and occupying approximately the bottom one-third of the safe was another burglarproof door controlled by a combination lock. The space behind the inner burglarproof door occupying approximately the bottom one-third of the safe is described in the policy and mentioned in the record as the inner chest of the burglarproof chest. Safe No. 2 had two-piece outer doors controlled by a combination lock and was used for safekeeping of watches. Safe No. 3 was used for storing the books and records of the business.

At the time of the loss on April 12, 1935, Safe No. 1 was used to retain and store the more precious articles. In the space above the lower burglarproof chest, trays

were provided in which were placed all rings and solid gold jewelry, and in the lower burglarproof chest, cash, checks, diamonds, loose diamonds, customers' diamond jobs, diamond wedding rings and the most expensive rings were placed.

Anthony Rose, who testified as a witness for the plaintiffs, was employed by the plaintiffs in the capacity of manager. His duties required him to take care of the store proper and of the customers, to be responsible for the help, to take care of merchandise and perform certain other duties including the opening and closing of the store.

Rose testified to the proper disposition of the merchandise at the close of business on April 11, 1935, as above outlined and that he personally tried the combinations on the doors of the safes before leaving. He opened the store on the morning of April 12, 1935, at about 7:45 a. m. and proceeded to the rear of the store for the purpose of turning on the lights. When almost to the counter separating the office from the customers' portion of the store, he heard some one enter whom he greeted with a "Good Morning." Receiving no answer, he turned around and discovered a person advancing toward him rapidly. Rose then hurried to the switch box in the rear of the store to turn on the lights, but after opening the door to the switch box he was commanded, "Don't turn on a buzzer."

His assailant then commanded Rose to "get busy and open those safes or I'll kill you." The fuse or switch box being adjacent to Safe No. 2, Rose started to manipulate the combination on that safe, temporizing in the hope that help would arrive. His assailant berated him and threatened to kill him if he did not open the safe and finally struck Rose across the head with a gun, cutting his scalp and causing it to bleed profusely. Blood flowed onto Rose's hands and the safe and as a result was smeared on the combination.

His assailant struck Rose on the head a second time with a gun, again cutting the scalp and causing the assailant's gun to discharge and the bullet to strike said Safe No. 2, after which the robber called to a confederate who evidently was standing watch at the front of the store. Blood having obliterated the combination dial, Rose was unable to manipulate the lock, and the robber then forced Rose to go from the office to Safe No. 1 in the store proper and ordered him to open that safe.

Rose had little difficulty in opening the doors by manipulating the combinations which he possessed and by the use of the key on the set of thin inner doors. While so opening the safe, bloody finger marks were left by Rose on the exterior of all three sets of doors of Safe No. 1. After the doors were opened by Rose, the robbers wired his hands behind him, threw him behind the partition, abstracted money and merchandise from the open Safe No. 1, took the keys to the store out of Rose's pocket and departed after locking the store doors behind them. Safes No. 2 and 3 in the rear office remained unopened.

A subsequent check-up disclosed that the men had taken the following from Safe No. 1: Cash from within the inner burglarproof chest, $103.45; loose and mounted diamonds from within the inner burglarproof chest, $8,223.54; watches, solid gold ring sets, neck pieces and customers' jewelry from within the safe, but outside the inner burglarproof chest, $8,561.98.

The insuring clause of the burglary policy indemnifies the plaintiffs against loss through the felonious abstraction of property from within the insured part of the safe and vault by persons making felonious entry into such safe and vault when all doors thereof are duly closed and locked:

"Provided that such entry shall be made by actual force and violence of which there shall be visible marks made by tools, explosives, electricity, gas or other

chemicals,. upon the exterior of (a) all of said doors of such safe and of the insured part thereof and of the vault, if any, containing such safe, if entry is made through such doors; or (b) the top, bottom or walls of such safe and of the insured part thereof and of the vault, through which entry is made, if not made through such doors.''

In addition thereto, the plaintiff carried a robbery policy at the time of the alleged loss under the terms of which plaintiff was indemnified by said company against loss by robbery through:

''(1) violence inflicted upon a custodian; (2) by putting him in fear of violence; (3) by an overt felonious act committed in the presence of a custodian and of which he was actually cognizant provided such action is not committed by an officer or employee of the assured.

The total coverage of the robbery policy was $2,500, and the total amount of the burglary policy in suit was $9,000. The plaintiffs had filed proof of loss and collected without suit under the combination robbery policy which covered both the stock and the contents of the safes and had characterized the assailants' acts as robbery, which acts they now claim to have also created a liability under the provisions of the burglary policy. The defendant had admitted liability and made settlement in the sum of $2,353.45 under the former, but denied liability under the latter policy now in suit. The combination $2,500 robbery policy covered all property ''in the premises,'' while the coverage under the safe burglary policy covered only certain property within the safes, viz.: ''insured property from within the insured part of such safe.''

Appellant assigned as error the striking of the last sentence of paragraph 6 from the complaint; failure to hold that the plaintiffs' loss is within the scope of the policy in suit; in not holding that the plaintiffs

suffered loss by burglary within the meaning of said policy of said merchandise within the chest in Safe No. 1 of the value of more than $5,000 and of merchandise in said safe but outside the chest thereof of the value of $1,000, and in not entering judgment for $6,000 in favor of the plaintiffs plus accrued interest thereon.

In order to recover under the terms of the burglary policy, it must appear from the evidence, as therein provided and required, not only that "the felonious abstraction of any of such insured property from within the insured part of such safe or vault, by any person or persons making felonious entry into such safe and such insured part thereof, and also into the vault, if any, containing such safe, when all doors of such safe and vault are duly closed and locked by all combination and time locks thereon," but it must further so appear "that such entry shall be made by actual force and violence of which there shall be visible marks made by tools, explosives, electricity, gas or other chemicals, upon the exterior of (a) all of said doors of such safe and of the insured part thereof and of the vault, if any, containing such safe, if entry is made through such doors."

Appellant undertakes to meet these requirements by the contention that the marks of the bullet and blood stains on Safe No. 2, which was not opened, was evidence of force and violence and of marks of tools and explosives upon Safe No. 1 and that the presence of blood stains from the fingers of appellants' employee Rose upon the doors of the latter safe, which was opened, constituted proof of the use of chemicals as provided in the policy and offered expert testimony to the effect that human blood is composed of chemical substances.

With neither of these contentions did the trial court agree, nor can this court concur in the forced construc-

tion sought to be placed on the plain and unambiguous language of the insurance contract in relation thereto. The bullet mark on Safe No. 2 was not proof of marks of either a tool, explosive or chemical on the doors of Safe No. 1, nor were the blood stains from the fingers of the appellants' employee any proof that such entry was made by "actual force and violence of which there shall be visible marks made by tools, explosives, electricity, gas or other chemicals" upon the doors of the safe into which felonious entry was made.

The policy was insurance of the sufficiency of the safe and vault contained therein against tools, explosives, electricity, gas or other chemicals used by burglars, and, obviously, did not comprehend a chemical such as blood, which is generated through the organic mechanism of the human body. *Komroff v. Maryland Casualty Co.*, 105 Conn. 402, 407; *Maryland Casualty Co. v. Ballard County Bank*, 134 Ky. 354, 360; *Blank v. National Surety Co.*, 181 Iowa 648, 653.

"Tools, explosives, electricity, gas or other chemicals" means those tools, explosives, electricity, gas or other chemicals used by burglars. *Maryland Casualty Co. v. Ballard County Bank, supra; Sturgis Nat. Bank v. Maryland Casualty Co.*, 252 Mich. 426, 430; *Komroff v. Maryland Casualty Co., supra.*

Felonious entry into a safe by actual force and violence has a well-defined meaning, and the very language employed in the policy herein excludes entry by manipulation through the agency of plaintiffs' employee. *Komroff v. Maryland Casualty Co., supra; United Sponging Co. v. Preferred Acc. Ins. Co. of N. Y.*, 161 N. Y. Supp. 309, 310; *Newark Dance Palace v. Maryland Casualty Co.*, 125 Misc. 869, 212 N. Y. Supp. 286, 287; *Brill v. Metropolitan Surety Co.*, 113 N. Y. Supp. 476, 477.

Appellant further contends that the terms of the policy were ambiguous and must therefore be construed most strongly against the company which wrote

the policy. While ambiguous language is to be construed against the insurer, no ambiguity should be created where none exists. *Crosse v. Supreme Lodge Knights & Ladies of Honor,* 254 Ill. 80, 98 N. E. 261; *Blume v. Pittsburgh Life & Trust Co.,* 183 Ill. App. 295, 298.

It is true that where the terms of a policy are of doubtful meaning, that construction most favorable to the insured will be adopted. This canon of construction is both reasonable and just, since the words of the policy are chosen by the insurance company; but it furnishes no warrant for avoiding hard consequences by importing into a contract an ambiguity which otherwise would not exist, or, under the guise of construction, by forcing from plain words unusual and unnatural meaning. Contracts of insurance, like other contracts, must be construed according to the terms which the parties have used, to be taken and understood, in the absence of ambiguity, in their plain, ordinary and popular sense. *Bergholm v. Peoria Life Ins. Co.,* 284 U. S. 489, 492, 76 L. Ed. 416, 52 Sup. Ct. 230; *Capps v. National Union Fire Ins. Co.,* 318 Ill. 350, 354, 149 N. E. 247; *Norwaysz v. Thuringia Ins. Co.,* 204 Ill. 334, 342, 68 N. E. 551.

The terms "robbery" and "burglary" each have different and well-defined meanings in law. The meaning of these respective terms, as used by the parties, was set forth in specific language in each of the two insurance contracts. Evidently the appellant recognized this distinction, since he took out policies protecting him to a greater or less extent against each contingency. We find no ambiguous language in the policy in question that would justify us in undertaking to modify or ignore its express provisions or in adopting a strained or forced construction thereof.

We do not deem the principles announced in the case of *Bernard v. Employers Liability Assur. Corp.,* 233 Ill. App. 229, or other cases cited by appellant to be

applicable to or controlling under the facts and decisive issues herein.

While we have not discussed all of the alleged errors set forth by the plaintiffs, we have fully considered them, and finding no reversible error in the record, the judgment of the circuit court of Sangamon county will be affirmed.

*Judgment affirmed.*